## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF CONNECTICUT
## NEW HAVEN DIVISION

| | | |
|---|---|---|
| SECURITIES AND EXCHANGE COMMISSION, | : | |
| | : | **CORRECTED** |
| Plaintiff, | : | **COMPLAINT** |
| | : | |
| v. | : | Civil Action No. |
| | : | |
| NICOLAS ZANEN and | : | |
| FRANCIS J. VAN STEENBERGE, | : | |
| | : | |
| | : | |
| Defendants. | : | |

Plaintiff United States Securities and Exchange Commission ("Plaintiff" or the "Commission") alleges:

### SUMMARY OF THE ACTION

1.       During 2011 and 2012, Nicolas Zanen, an employee of a subsidiary of Texas-based Cheniere Energy, Inc. ("Cheniere") gave Francis J. van Steenberge instructions to trade Cheniere options and otherwise provided him with material non-public information about Cheniere. Directed by Zanen, van Steenberge traded in Cheniere options, yielding ill-gotten gains of approximately $800,000, which the two intended to share equally.

2.       In late 2011, Zanen began disclosing to van Steenberge information related to forthcoming public announcements by Cheniere and one of its subsidiaries with the understanding that van Steenberge and Zanen would split the proceeds of resulting trades. At that time, van Steenberge had never traded in Cheniere securities, had never traded in options, and had not made any trades in his brokerage account for nearly three years. Beginning in late 2011 and continuing through 2012, van Steenberge engaged in profitable trading in Cheniere

options that was timed to take advantage of price movements in Cheniere stock resulting from public announcements made by Cheniere and a subsidiary.

3.      By reason of these activities, Defendants van Steenberge and Zanen violated Section 10(b) [15 U.S.C. § 78j(b)] of the Securities Exchange Act of 1934 ("Exchange Act"), and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

4.      To protect the public from any further fraudulent activity and harm, the Commission brings this action against Defendants seeking: (i) permanent injunctive relief; (ii) disgorgement of ill-gotten gains resulting from Defendants' violations of federal securities laws; (iii) accrued prejudgment interest on those ill-gotten gains; and (iv) civil monetary penalties.

## JURISDICTION AND VENUE

5.      The Commission brings this action pursuant to the authority conferred upon it by Section 21(d) of the Exchange Act [15 U.S.C. § 78u(d)] and Sections 20(b) and 20(d) of the Securities Act [15 U.S.C. §77t(b) and 77t(d)].  The Commission seeks the imposition of civil penalties pursuant to Section 21A of the Exchange Act [15 U.S.C. § 78u-1].

6.      This Court has jurisdiction over this action pursuant to Sections 20(b), 20(d) and 22(a) of the Securities Act [15 U.S.C. §§ 77t(b), 77t(d), and 77v(a)] and Sections 21(d),  21(e), 21A and 27 of the Exchange Act [15 U.S.C. §§ 78u(d), 78u(e), 78u-1 and 78aa].  Defendants, directly and indirectly, made use of the mails and of the means and instrumentalities of interstate commerce in connection with the acts, practices and courses of business described in this Complaint.

7.      Venue is proper because the transactions, acts, practices and courses of business described below occurred within the jurisdiction of the District of Connecticut.

## DEFENDANTS

8.      At all times relevant to the Complaint, Francis J. van Steenberge, age 43, worked

as a financial planning and analysis manager in corporate operations group of a publicly traded

company.  Van Steenberge has been a United States citizen since 2011.  He currently resides in

Ireland.

9.      Nicolas Zanen, age 42, has been employed at all times relevant to this Complaint

as Vice President of Trading at Cheniere International, Inc., a subsidiary of Cheniere.  At all

times relevant to this Complaint and at the present time, Zanen resides and works in London,

United Kingdom.

## STATEMENT OF FACTS

### A.      *Background on Cheniere's Business and Public Statements in 2011 and 2012*

10.     Cheniere is a company that develops natural gas infrastructure.  In 2011, Cheniere

undertook a plan to convert its existing natural gas import facilities in the Sabine Pass region of

Louisiana into natural gas export facilities.  This facility conversion process sought to take

advantage of potentially lucrative opportunities to export domestic natural gas to Europe and

Asia.

11.     In connection with the development of the Sabine Pass facility, during 2011 and

2012, Cheniere and its subsidiary, Cheniere Energy Partners, L.P. ("Cheniere Partners"), made

several public announcements about the status of regulatory approvals, financing, and entry into

long-term supply contracts with gas importers.  Many of these announcements had a material

impact on Cheniere's stock price.  Cheniere's stock traded at $2-3 per share in January 2011.  By

December 2012, its price had increased to $48 per share.

12.     As discussed in further detail below, Zanen conveyed to van Steenberge information that prompted van Steenberge to trade profitably ahead of the following public announcements in 2011 and 2012:

| Announcement Date | Subject of Announcement |
|---|---|
| October 26, 2011 | Cheniere Partners announces entry into natural gas sale and purchase agreement with BG Gulf Coast LNG, LLC ("BG"). |
| November 21, 2011 | Cheniere Partners announces entry into natural gas sale and purchase agreement with Gas Natural Fenosa ("Fenosa"). |
| December 13, 2011 | Cheniere announces sale of 33 million shares of common stock in an underwritten public offering. |
| January 26, 2012 | Cheniere Partners announces entry into an amended sale and purchase agreement with BG pursuant to which BG has agreed to increase its purchase of natural gas. |

**B.     *Zanen's Access to Material Non-Public Information about Cheniere***

13.     During the relevant time period, Zanen worked for Cheniere International, Inc., a subsidiary of Cheniere.

14.     Zanen routinely learned of material non-public information originating both within and outside his area of responsibility.  This information was confidential and Cheniere employees understood that it should be treated as such.  While employed at Cheniere, Zanen had completed training relating to insider trading prohibitions, signed agreements undertaking to preserve confidentiality of Cheniere information, and received copies of Cheniere's insider trading policy.

15.     As an employee of Cheniere, Zanen owed his employer a fiduciary duty, or an obligation arising from a relationship of trust and confidence, to maintain the confidentiality of

Cheniere's information regarding its strategic transactions and to refrain from misappropriating information regarding Cheniere's potential business relationships for his own personal profit.

16.     Zanen participated in phone calls in which Cheniere management provided information to its employees about the implementation of Cheniere's natural gas export business plan. These calls informed participants of, among other non-public information, the status of Cheniere's regulatory applications pending before certain governmental authorities relating to gas exportation.

17.     By misappropriating Cheniere's confidential information as alleged below, Zanen breached his duty to Cheniere as well as Cheniere's stated policies and procedures regarding confidentiality and securities trading.

18.     At the time of each illegal trade identified in this Complaint, the misappropriated information was confidential, non-public, and material.

**C.     *Van Steenberge's Relationship with Zanen***

19.     Van Steenberge and Zanen attended college together in the mid-1990s. After graduation, the two had occasional contact, via phone and in person. Before July 2011, their face to face contacts included van Steenberge meeting with Zanen in London and Zanen meeting van Steenberge in Atlanta. Zanen also attended van Steenberge's wedding in Belgium.

20.     In July 2011, van Steenberge had a chance meeting with Zanen while each was on vacation at the same resort in the Dominican Republic. Their vacation stays overlapped by approximately two days.

21.     During these two days in July 2011, Zanen told van Steenberge about his work at Cheniere and discussed generally Cheniere's plans to take advantage of the relatively cheap U.S. natural gas prices by exporting U.S. natural gas to Europe and Asia. Zanen offered to give van

Steenberge advice on investing money and told van Steenberge that they could trade together on the basis of "moité-moité." Zanen and van Steenberge spoke French when speaking to each other. The French phrase "moité-moité" means "half-and-half," or "fifty-fifty" in English.

## D.     Insider Trading

### a.  Van Steenberge's Prior Trading History

22.     As of August 2011, van Steenberge's only brokerage account held cash and money market securities with a combined value of approximately $8,200. The account had been essentially inactive since November 2008. Between 2006 and 2008, van Steenberge had traded in equities, with the value of his portfolio never exceeding $100,000. Van Steenberge had stopped trading in 2008 after he lost money in stocks during the financial crisis, and did not resume trading until Zanen began instructing him as described below.

### b.  Trading ahead of the October 26, 2011 Announcement

23.     During conversations prior to Cheniere's October 26, 2011 announcement of its gas sale and purchase agreement with BG, Zanen told van Steenberge that Cheniere was negotiating gas supply deals with BG and other companies that would soon come to fruition.

24.     On September 7, 2011, Zanen explained the logistics of option trading to van Steenberge, generally, over the telephone. Zanen directed van Steenberge to publicly available information about Cheniere and told van Steenberge that, in line with this information, van Steenberge should buy Cheniere call options expiring in December 2011. Zanen further directed van Steenberge as to the strike price and expiration date at which the options were to be purchased.

25.     On September 8 and 9, 2011, van Steenberge bought Cheniere call options with a December 17, 2011 expiration date at the strike price of $12 per share (at a time when Cheniere stock was trading at approximately $7 per share).

26.     In early October 2011, van Steenberge purchased more Cheniere call options expiring in December 2011 at strike prices of $11 and $12 per share (at a time when Cheniere stock was trading below $5 per share).

27.     In early October, 2011, Zanen told van Steenberge, via Skype, that (i) van Steenberge should also buy call options expiring in November 2011 (at specified volumes and strike prices) because gas supply deals Cheniere was negotiating would soon come to fruition, and (ii) Zanen had signed a document at Cheniere's request that prohibited him from trading in Cheniere securities.  The status of Cheniere's negotiations was material non-public information. On October 7, van Steenberge purchased Cheniere call options expiring in November 2011 at strike prices of $9-$11 per share.

28.     During the second half of October 2011, Zanen directed van Steenberge to buy as many November call options as he could.  Van Steenberge complied, continuing to buy Cheniere call options expiring in November 2011 at the same strike prices.  The price of Cheniere stock did not exceed $6.35 on the days in October that van Steenberge purchased Cheniere call options.

29.     On October 26, 2011, Cheniere Partners announced that its subsidiary had entered into a long term natural gas sales and purchase agreement with BG, a major British utility company.  The announcement was significant for Cheniere because Cheniere's ability to finance construction of its gas export facilities depended on the company contracting guaranteed future export capacity at such facilities.  Moreover, BG was the first party to enter into such a contract

with Cheniere, and the volume of gas that BG contracted to purchase represented approximately twenty percent of the then-total projected capacity at Cheniere's planned facility.  Cheniere stock closed at $10.32 per share on October 26 (compared to a close of $6.12 the prior day, representing an approximately 68.6 percent increase over the prior day) on trading volume of approximately 32.5 million shares (compared to a trading volume of approximately 1.75 million shares the prior day).  Van Steenberge's option purchases at Zanen's direction ahead of the October 26 announcement resulted in an approximate profit of $287,067.50.

30.     Zanen expressed disappointment that van Steenberge had not invested more money in advance of the October 26 announcement.  During Skype conversations in the days following the announcement, Zanen set a goal of making $1 million in their trading in Cheniere options and told van Steenberge that they would figure out how to split the proceeds later.

### c.  Trading ahead of the November 21, 2011 Announcement

31.     After market close on November 21, 2011, Cheniere Partners announced a long-term natural gas sales and purchase agreement of nearly half the capacity of its Sabine Pass plant, with Fenosa – a major Spanish gas and electric company.  Again using non-public information, Zanen instructed van Steenberge to place certain options trades in advance of the Fenosa announcement.

32.     On or about November 11, 2011, Zanen's domestic partner contacted van Steenberge, passing a message from Zanen directing van Steenberge to "buy, buy, buy" Cheniere December and January call options.  Van Steenberge immediately purchased approximately $90,961 worth of Cheniere call options expiring in December 2011 at strike prices of $11-$13 (Cheniere stock closed at $10.56 on November 11).

33.     On the same day, Zanen personally contacted van Steenberge and instructed him to continue buying call options, but at higher strike prices than previously instructed.

34.     On November 14, 2011, van Steenberge purchased an additional $94,406 worth of Cheniere call options expiring in December 2011 at strike prices of $13-$16, as well as 1,500 shares of Cheniere stock at $11.60 per share for a total of $17,410.

35.     After the market closed on November 21, 2011, Cheniere Partners announced that its subsidiary had entered into a long term natural gas sales and purchase agreement with Fenosa. The announcement was significant for Cheniere because Cheniere's ability to finance construction of its gas export facilities depended on the company contracting guaranteed future capacity at such facilities.

36.     Cheniere stock opened at $12.55 on November 22, 2011 (an approximate 9.3 percent increase over the prior day's closing price of $11.48), and traded on volume of approximately 11.6 million shares (compared to a volume of approximately 4.1 million shares the prior day).  Although the stock closed at $11.34 on November 22, van Steenberge sold nearly all of his open options positions before 10:00 a.m. on November 22, at a time when Cheniere's stock price rendered his options very valuable.  Van Steenberge's timely call option purchases at Zanen's direction ahead of the November 21 announcement resulted in a profit of $103,838.

### d.  *Trading ahead of the December 13, 2011 Announcement*

37.     After market close on December 13, 2011, Cheniere announced its intent to offer 33 million shares of common stock in an underwritten public offering, with the proceeds to be used for general corporate purposes and repayment of debts.  Again using non-public information, Zanen instructed van Steenberge to place certain options trades in advance of the announcement.

38.     On or about December 2, 2011, van Steenberge traveled to Hong Kong for the specific purpose of meeting Zanen in person.  In Hong Kong, after Zanen raised the issue of "settling up" on the Cheniere profits, they discussed various means of secretly splitting the trading profits generated in van Steenberge's brokerage account by the trading directed by Zanen.  Zanen told van Steenberge that he wanted van Steenberge to buy diamonds or gold that he would then give to Zanen.  Zanen and van Steenberge did not decide at this time how to implement their profit-splitting plan.

39.     After the December 2 meeting, on or about December 10, 2011, Zanen instructed van Steenberge via telephone to buy put options (at specified strike prices, expiration dates, and volumes).  On the morning of December 12 and 13, 2011, the next two trading days after the December 10 call, van Steenberge purchased approximately $190,000 worth of Cheniere put options expiring in January 2012 at strike prices of $7-$10 (Cheniere stock closed at $10.04 on December 12).

40.     After the market closed on December 13, 2011, Cheniere announced its intent to offer 33 million shares of common stock in an underwritten public offering, with proceeds to be used for general corporate purposes and repayment of indebtedness.  The announcement had a significant effect on Cheniere's stock price.  On December 14, 2011, the first trading day following the December 13 announcement, Cheniere stock closed at $8.39 (compared to closing price of $9.39 on December 13, representing an approximately 11.9 percent decrease over the prior day) on trading volume of approximately 23 million shares (compared to trading volume of 3 million shares on December 13).  Van Steenberge's trading at Zanen's direction prior to the December 13 announcement resulted in a profit of $118,575.

### *e. Trading ahead of the January 26, 2012 Announcement*

41.     After market close on January 26, 2012, Cheniere Partners announced an
amended agreement for its subsidiary to sell additional volumes of natural gas to BG, such that
Cheniere had now contracted to sell approximately 70% of the total liquification capacity of the
plant it would construct at Sabine Pass.  Again using non-public information, Zanen instructed
van Steenberge to place certain option trades in advance of the announcement.

42.     On or about January 11, 2012, Zanen instructed van Steenberge to buy call
options expiring in February at specified strike prices and volume.  On the morning of January
12, 2012, van Steenberge bought approximately $235,000 worth of Cheniere call options
expiring in February 2012 at strike prices of $10-$11 (Cheniere stock closed at $9.46 on January
12).

43.     During a January 22, 2012 phone call, Zanen suggested to van Steenberge that
they establish a Cayman Islands company to own a condominium to be purchased with their
trading profits in Cheniere securities.

44.     After the market closed on January 26, 2012, Cheniere Partners announced that its
subsidiary had entered into an amended sale and purchase agreement with BG pursuant to which
BG agreed to increase its purchase of liquefied natural gas from Cheniere.  The announcement
had an effect on Cheniere's stock price.  On January 27, 2012, the first trading day following the
January 26 announcement, Cheniere stock closed at $12.71 (compared to closing price of $11.37
on January 26, representing an approximately 11.7 percent increase over the prior day) on
trading volume of approximately 10.9 million shares (compared to trading volume of 8 million
shares on January 26).  Van Steenberge's timely call option purchases at Zanen's direction ahead
of the January 26 announcement resulted in a profit of $290,245.00.

### f. Other Activities in Furtherance of the Scheme

45.     Later, in late March 2012, Zanen traveled to Connecticut and New York to visit van Steenberge after Zanen attended a business meeting in Houston, Texas.  On March 26, 2012, Zanen suggested that van Steenberge buy gold, diamonds, watches, jewelry, cash, or property in order to split the proceeds of their trades with Zanen.  Zanen told van Steenberge that they should use code language to discuss further Cheniere trading activity.

46.     In addition to using code language, Zanen sought to conceal his tipping by occasionally instructing van Steenberge during Skype conversations by silently directing his computer's camera to a page on which Zanen had written trading instructions.

47.     Van Steenberge was contacted by staff of the Commission before he and Zanen split their trading proceeds.  At the time he was contacted by Commission staff, van Steenberge had built a call option position in Cheniere securities based on Zanen's trading instructions in anticipation of another pending announcement by Cheniere.  Van Steenberge exited this position on December 4, 2012, four days after the SEC contacted him and before Cheniere made the relevant announcement.  If he had waited until after Cheniere's December 17, 2012 announcement of a natural gas sale and purchase agreement with Total, S.A., a major French energy company, van Steenberge would have made about $93,000 from these options.

48.     At the time he was contacted by the Commission staff, van Steenberge's trades on Zanen's instructions had netted approximately $800,000 – about $200,000 short of Zanen's stated goal.

## CLAIMS FOR RELIEF

### FIRST CLAIM
### Violations by Defendants van Steenberge and Zanen of Exchange Act
### Sections 10(b) and Rules 10b-5 Promulgated Thereunder

49.     Paragraphs 1 through 48 are realleged and incorporated by reference.

50.     Defendants, by engaging in the conduct described above, directly and indirectly, in connection with the purchase and sale of securities, and by use of the means and instrumentalities of interstate commerce and of the mails, has: (a) employed devices, schemes and artifices to defraud; (b) made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; and (c) engaged in acts, practices or courses of business that have operated or will operate as a fraud and deceit upon other persons.

51.     Defendants intentionally, knowingly or recklessly made the untrue statements and omissions and engaged in the devices, schemes, artifices, transactions, acts, practices and courses of business described above.  Defendants traded securities while in possession of material non-public information that they knew was conveyed in breach of a fiduciary duty or in breach of a duty arising from a similar relationship of trust or confidence.

52.     By reason of the foregoing acts and practices, Defendants violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 [17 C.F.R. § 240.10b-5] thereunder.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests that this Court enter a judgment:

(i)     Permanently enjoining Defendants from violating Section 10(b) [15 U.S.C. § 78j(b)]  of the Exchange Act, and Rule 10b-5 [17 C.F.R. § 240.10b-5 thereunder.

(ii)     Ordering Defendants to disgorge all ill-gotten gains from the conduct alleged

herein, with prejudgment interest;

(iii)    Ordering Defendants to pay civil monetary penalties pursuant to Section 21A of

the Exchange Act [15 U.S.C. §78u-1] for his violations of the federal securities laws as alleged

herein; and

(iv)    Granting such other relief as this Court may deem just and appropriate.


October 13, 2015                                    Respectfully submitted,



                                    s/ Matthew J. Gulde
                                    Matthew J. Gulde
                                    Illinois Bar No. 6272325
                                    S.D. Texas Bar No. 1821299
                                    United States Securities and
                                    Exchange Commission
                                    Burnett Plaza, Suite 1900
                                    801 Cherry Street, Unit 18
                                    Fort Worth, TX  76102
                                    Telephone:  (817) 978-1410
                                    Facsimile:  (817) 978-4927
                                    E-mail: guldem@sec.gov


                                    John B. Hughes (CT05289)
                                    Connecticut Federal Bar No. ct05289
                                    Assistant United States Attorney
                                    Chief, Civil Division
                                    United States Attorney's Office
                                    Connecticut Financial Center
                                    157 Church St., 25th Floor
                                    New Haven, CT 06510
                                    Telephone: (203) 821-3700
                                    Facsimile: (203) 773-5373
                                    E-mail: John.Hughes@usdoj.gov